In the Matter of the Application of MID-WEST SECURITY TRANSFER, INC. (SD PUC Motor Carrier Docket No. 22861–B).

No. 14363.

Supreme Court of South Dakota.

Considered on Briefs.

Decided Sept. 7, 1984.

Karen E. Bjerke of Hagen & Wilka, Sioux Falls, and Michael J. Ogborn of Nelson & Harding, Lincoln, Neb., for appellant Purolator Courier Corp.

A.J. Swanson of Quaintance, Swanson & Johnson, Sioux Falls, for intervenor and appellee Midwest Security Transfer, Inc.

WOLLMAN, Justice.

This is an appeal by Purolator Courier Corporation (Purolator) from a judgment of the circuit court that affirmed the decision

of the South Dakota Public Utilities Commission (Commission), to grant Midwest Security Transfer, Inc. (Midwest) authority to operate as a Class B common carrier in the State of South Dakota.[1] We affirm.

Midwest Security applied for a Class B common carrier license on July 1, 1981. Purolator and Jack Rabbit Lines, Inc., filed objections and requested an oral hearing.[2] The Commission served notice of informal conference on the parties on October 1, 1981. That conference was held on October 22, 1981, following which the Commission issued an order for and notice of hearing, which stated in part that the Commission had determined that Midwest's application should not be disposed of until after hearing and ordered that evidence be submitted in written form. This order and notice also provided that unless material facts were in dispute, an oral hearing would not be held for the sole purpose of cross-examination.

At the same time as it filed its application for a Class B license, Midwest also applied for temporary authority, pursuant to SDCL 49–28–13, to act as a Class B carrier. This application for temporary authority was supported by statements from four separate shippers attesting to the need for Midwest's proposed Class B carrier services. The Commission granted Midwest a temporary permit on October 7, 1981.

Verified written statements were filed in support of and in opposition to the application. Purolator's request for oral hearing was denied, and on October 27, 1982, the Commission granted the application. Following the denial of its petition for rehearing or reconsideration, Purolator appealed to the circuit court. Jack Rabbit Lines, Inc. did not appeal.

At the time it filed its application, Midwest held Interstate Commerce Commission common carrier authority to transport shipments weighing one hundred pounds or less. In addition, Midwest held several Class C permits from the Commission that authorized it to carry shipments of certain goods pursuant to contract with individual shippers. Midwest operates its vehicles out of Sioux Falls, Aberdeen, and Mitchell. Midwest operates its business in two divisions, an armored car division, which utilizes specially designed vehicles in the movement of money and negotiable securities, and the courier division, which operates station wagons and cargo vans both in interstate and intrastate commerce. The courier division began operations in February 1981. Essentially, it consists of the transportation of banking materials, with a substantial related business in small packages and parcels.

As set forth in his verified statement in support of the application for a Class B permit, David Daggett, President of Midwest, stated that Midwest's vehicles had significant capacity to carry other parcels for the general public in addition to providing courier service for various banks on a five-day-a week basis. The Class B permit service permit it intended to provide would entail small, time-sensitive packages, with a choice of either door-to-door or station-to-station service. The Class B permit authority would complement the interstate common carrier authority it already held. Although he acknowledged that Midwest had suffered a net loss of some $23,000 during 1981, Daggett stated that based upon the profits thus far realized in 1982 (his verified statement was prepared on March 31, 1982), he anticipated that the courier division would show a significant profit for the year.

The verified statement concluded by pointing out that Midwest maintained insurance equal to or in excess of federal and state agency requirements, had an active and effective safety program, and was willing and able to comply with any reasonable special directive or requirements of the

1. The area covered by the application included all points in the state east of Campbell, Walworth, Potter, Sully, Stanley, Jones, Mellette, and Todd counties.

2. Purolator applied for and received a Class B permit during the pendency of Midwest's application.

Commission in implementing service as a Class B carrier.

Purolator filed a verified statement in opposition to Midwest's application. This statement outlined the adequacy of the service then being provided by Purolator, set forth the adverse consequences to Purolator's business should Midwest's application be granted, and requested the right to cross-examine Daggett with respect to the fitness of Midwest to receive the Class B authority for which it had applied and with respect to its allegations concerning the alleged public need for the service it proposed to provide.

Daggett then filed a verified reply statement, which included a profit and loss statement for the first quarter of calendar year 1982 showing a net profit of some $14,500 for the quarter. The reply statement also contained a list of new shipper contracts entered into pursuant to the authority granted under Midwest's Class C permits.

The Commission found, among other things, that although Midwest's Class C authority had permitted it to enter into contracts with many large volume and regular shippers who have predictable service needs, infrequent or occasional shippers are unable to utilize the Class C contract carrier service on a short-notice basis. The Commission found that Midwest had established that there was a need for the transportation of small packages between all points throughout the area it wished to serve, that present common carrier service for express delivery of small packages was not wholly adequate, that Midwest had established that it was fit, willing, and able to provide the service to be authorized by the Class B permit, and that the transportation for which Midwest sought authority had been shown to be consistent with the public convenience and necessity.

Purolator's first contention is that it was denied due process of law by the Commission inasmuch as the Commission admitted in the brief it filed in the circuit court that in granting Midwest's application it had relied upon information submitted by Midwest in connection with its request for temporary authority as a Class B carrier. Because the Commission's circuit court brief is not a part of the record before us, however, this argument is not well taken.

■■■ Second, Purolator contends that it was denied due process because the Commission violated its own procedure when it denied Purolator's request for a hearing for the purpose of cross-examining Daggett. As Purolator points out, we have held that a procedure adopted by an agency pursuant to the Administrative Procedures Act, SDCL ch. 1–26, acquires the force and effect of law. *Valley State Bank of Canton v. Farmers State Bank*, 87 S.D. 614, 213 N.W.2d 459 (1973). Although it concedes that it is within the discretion of the Commission whether to hold a hearing in a Class B license application proceeding, Purolator contends that the Commission abused that discretion and deprived Purolator of its procedural rights when it cavalierly disregarded the procedure established in its published order. We do not agree. Granted that the constitutional guarantee of due process of law must be applied to and observed in administrative proceedings involving adversary parties, *Application of Union Carbide Corp.*, 308 N.W.2d 753 (S.D.1981), we conclude that the procedure followed by the Commission afforded Purolator adequate process. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelley*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Next, Purolator contends that the Commission misconstrued SDCL 49–28–14, which, at all times material herein, provided as follows:

> Before granting a permit as a class A or class B motor carrier, the commission shall take into consideration:
>
> (1) The need for the service proposed by the applicant;
>
> (2) The effect on other existing transportation facilities currently serving the territory for which a permit is sought;

(3) The adequacy of of [sic] current service; and

(4) The fitness, willingness and ability of the applicant to provide the service to be authorized by the permit and to comply with the requirement of this chapter as to safety and any rules promulgated thereto.

The commission shall issue a permit unless it finds on the basis of evidence presented by persons objecting to the issuance of a permit that the transportation to be authorized by the permit is inconsistent with the public convenience and necessity. The fact that the issuing of a permit would divert revenue or traffic from an existing carrier shall not be the sole reason of the commission for denying a permit.[3] Such permit shall authorize the applicant to operate as a motor carrier from the date of issue until such time the permit is voluntarily terminated by the carrier or revoked by the commission as provided in § 49–28–19.

Purolator contends that the circuit court erred in holding that public need is merely one factor to be considered by the Commission and is not a requirement that must be met before a license is issued.

■ As we held in *Application of Leo's Bus Service, Inc.*, 342 N.W.2d 228, 230 (S.D.1984),

[t]he dispositive question under the 1981 version of SDCL 49–28–14 is whether or not those objecting to the permit have met their burden of showing "issuance of a permit ... is inconsistent with the public convenience and necessity."

■ As in *Leo's Bus Service, Inc.*, *supra*, we are satisfied on the basis of the record before us that the Commission did consider the four factors, including need, set forth in the 1981 version of SDCL 49–28–14. Accordingly, whether the circuit court's interpretation of this statute was correct is irrelevant.

Finally, Purolator contends that the Commission's findings of fact and conclusions of law are clearly erroneous and are arbitrary and capricious. We do not agree.

■ Granted that the evidence bearing on the question of need and the adequacy of the present service was not voluminous, after giving due deference to the Commission's role as fact finder, we conclude that in the light of the entire record the Commission's findings on these matters were not clearly erroneous. SDCL 1–26–36(5). *Leo's Bus Service, Inc., supra.* Likewise with respect to the Commission's findings regarding the fitness of Midwest to provide the proposed service. Although Midwest by its own admission was a fledgling business that was only beginning to show a profit at the time Daggett filed his statement in March of 1982, we conclude that it was for the Commission, charged as it is with the responsibility for licensing carriers, to make the determination regarding the financial fitness of a proposed carrier. In the light of Midwest's improving financial picture, we cannot say that the Commission's finding in this regard was clearly erroneous.

In view of the fact that the Commission's findings were not clearly erroneous, its decision to grant Midwest the authority it sought cannot be characterized as being arbitrary and capricious.

The order affirming the Commission's decision is affirmed.

FOSHEIM, C.J., and DUNN and MORGAN, JJ., concur.

HENDERSON, J., deeming himself disqualified, did not participate in this opinion.

---

**3.** This statute was substantially amended by 1983 S.D.Sess.Laws ch. 339.